**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION**

JOSE CASTRO,                          §
       *Plaintiff*                §
                          §
-vs-                                  §       SA-20-CV-01022-XR
                          §
KIMBERLY KORY, MICHAEL                §
THORNTON, CARL KERAWALLA,             §
SHAWN KING,  UNKNOWN SAN              §
ANTONIO POLICE OFFICER(S),            §
       *Defendants*               §

## ORDER

On this date, the Court considered Plaintiff's motion to limit the expert testimony of James R. Holguin (ECF No. 58), the parties' motions for summary judgment (ECF Nos. 59, 63), and the briefing filed in response to the parties' motions. After careful consideration, the Court issues the following order.

## BACKGROUND[1]

Plaintiff Jose Castro asserts claims under 42 U.S.C. § 1983 for violations of his Fourth and Fourteenth Amendment rights arising out of his detention by four San Antonio Police Department ("SAPD") officers for over an hour on the morning of August 30, 2018, during which the officers allegedly subjected him to an unlawful search and seizure and constitutionally excessive force.

### I.      The Investigatory Stop

Plaintiff Jose Castro is a pastor who frequently delivers animal supplies to veterinary hospitals between Dallas and San Antonio, Texas. ECF No. 18 at 4. Plaintiff rented an Enterprise box truck to make these deliveries. *Id*. On August 30, 2018, after completing a delivery to

---

[1] The following facts are undisputed unless otherwise noted.

Mission Veterinary Clinic in San Antonio at approximately 4:50 a.m., Plaintiff decided to take a nap before resuming his deliveries. ECF No. 69-3 at 2. Plaintiff parked his truck about 150–200 yards away from the clinic in a vacant, private lot in the same shopping center, Hausman Village, where he had parked in several times before. *Id*. Plaintiff left the door to the truck ajar for ventilation and fell asleep. *Id*.

Carl Kerawalla, a detective in the SADP Property Crimes Unit, was patrolling the area that morning in plain-clothes and an unmarked police vehicle that was not equipped with emergency lights. ECF No. 61-2 at 9; ECF No. 63-1 at 35.[2] Kerawalla noticed a truck parked off the main road with one door ajar. ECF No. 59-4 at 12. Despite receiving no reports of trespassing, criminal activity, or suspicious-persons complaints that were associated with this property, *id*. at 34, 55, Kerawalla parked behind the truck to investigate, *id*. at 14.

At that point, Kerawalla saw no weapons on the scene and perceived no "immediate threats" from the truck. *Id*. at 37–39. He had dispatch run the plates on the truck, which did not come back as stolen. *Id*. at 22. According to later testimony, Kerawalla "didn't have any facts [indicating] a specific criminal act" had occurred with respect to the truck, but he suspected its possible criminal uses.[3] *Id*. at 21–24. Thus, Kerawalla called for uniformed support and alerted officers that he had identified a suspicious vehicle. *Id*. at 30. Once the officers were called, Kerawalla waited by his car and conducted no further investigation. *Id*. Police body cameras and witness video footage captured the events that followed from multiple angles. *See* ECF No. 59-8 (affidavit authenticating body camera footage cited herein).[4]

---

[2] All citations to the record cite the PDF page number, which is not necessarily the same page number as the underlying document.

[3] Kerawalla later testified that he had investigated "several" prior cases involving U-Haul trucks and ATM thefts. However, he could not provide a date for these occurrences and stated that he personally knew of no burglaries involving Enterprise box vans that occurred within 30 days prior to the incident. ECF No. 62-1 at 13–14.

[4] *See* Ronda Jones, *SAPD18184814 Thornton, Michael*, YᴏᴜTᴜʙᴇ (Mar. 6, 2022) (hereinafter, "Thornton Vid."), https://www.youtube.com/watch?v=lBgbDJhgXRM; Ronda Jones, *SAPD18184814 Kory*, YᴏᴜTᴜʙᴇ (Mar.

Uniformed officers Kimberly Kory and Michael Thornton arrived on the scene within a few minutes. See ECF No. 62-1 at 24. Upon arrival, Kory and Thornton relied on Kerawalla's assessment of the situation and performed no further independent investigation. ECF No. 63-4 at 16; ECF No. 59-7 at 5. All three officers emerged from their respective vehicles with their weapons drawn and pointed at Plaintiff's truck. Thornton did not activate his vehicle's flashing lights.

## II.    Plaintiff's Arrest

Thornton exited his vehicle and conducted a "ghost call" identifying the officers as members of the San Antonio Police Department and instructing any occupant of the vehicle to "come out with your hands up." Thornton Vid. at 00:01:03. After a couple of moments, Plaintiff told officers that he "can't come out," *id.* at 00:01:25, apparently because he was not fully clothed. *See* Kory Vid. at 00:01:40 (Kory stating that the occupant is "not clothed"). Plaintiff and Thornton engaged in a verbal back-and-forth in mixed Spanish and English. At several points, Thornton identified himself as a member of the SAPD and ordered Plaintiff to exit the truck. Plaintiff responded, shouting to the Officers that he was on a delivery. Thornton Vid. at 00:01:32–40. Plaintiff did not exit his car. *Id.*

However, it quickly became clear to the Officers that Plaintiff did not understand, or did not believe, that Kerawalla, Thornton, and Kory were, in fact, police officers.[5] After several minutes, Plaintiff turned on his truck. He made no attempt to drive away or flee the scene but

---

6, 2022) (hereinafter, "Kory Vid."), https://www.youtube.com/watch?v=JFCKLhewbfI; Ronda Jones, *SAPD18184814 Kerawalla*, YOUTUBE (Mar. 6, 2022) (hereinafter, "Kerawalla Vid."), https://www.youtube.com/watch?v=rVt0j1WO_NE; Ronda Jones, *SAPD18184814 King*, YOUTUBE (Mar. 6, 2022) (hereinafter, "King Vid."), https://www.youtube.com/watch?v=dEF8J6jCrf4; Ronda Jones, *SAPD18184814 Garcia*, YOUTUBE (Mar. 7, 2022) (hereinafter, "Garcia Vid."), https://www.youtube.com/watch?v=PCWA1QEhXiI.

[5]Thornton Vid. at 00:02:00 (Thornton stating they are "the real police"); *id.* at 00:04:04 (Plaintiff stating that he "needs the police"); *id.* at (unknown officer stating that Plaintiff is "not believing us"). This becomes even clearer later in the footage, when Plaintiff is heard telling dispatch that "you need to send the police right now," *id.* at 00:4:08–18, and yelling to Kerawalla, Thornton, and Kory that "you are not the police," *id.* at 00:04:58.

activated his vehicle's hazard lights.[6] *Id.* at 00:02:10; ECF No. 59-4 at 52–53 (Kerawalla testifying that Castro made no "overt" act to flee the scene); ECF No. 59-5 at 11 (Kory testifying that she did not observe Castro engaging his brake lights). After a minute of no interaction, Thornton activated his squad car's flashing lights and, using his intercom, ordered Plaintiff to leave the vehicle. Thornton Vid. at 00:03:00. Kerawalla exchanged his handgun for his personal AR-15, kept in his unmarked police vehicle. Kerawalla Vid. at 00:00:53; ECF No. 59-4 at 44; ECF No. 63-1 at 36.[7]

Although the Officers kept their weapons trained on Plaintiff, he did not make any verbal threats of violence, bodily injury, or death. ECF No. 63-1 at 39. Instead, it became apparent that Plaintiff was on the phone with 911, and Kerawalla informed the Officers that Plaintiff did not hold a weapon in his other hand. *See* Thornton Vid. at 00:07:08 (Thornton stating that he "think[s] he called 911"), Kerawalla Vid. at 00:01:45 (stating that one of Plaintiff's hand was holding the phone and the other was empty); Kory Vid. at 00:03:24.

When Plaintiff remained inside the cab of the truck, the Officers' orders escalated. ECF No. 63-1 at 3.[8] Thornton instructed Plaintiff that "you are thirty seconds away from a trip to the hospital and going to jail." Thornton Vid. at 0:03:15–53. Both Thornton and Kerawalla threatened to shoot the truck's tires. ECF No. 59-4 at 45. Kerawalla had his assault rifle trained on Plaintiff's head. Kerawalla Vid. at 0:04:08 (Kerawalla shouting to colleagues that he has a

---

[6] Plaintiff's affidavit in support of his motion for partial summary judgment explains that he turned on the car "so I could have light, and I turned on my emergency flashers so the police could find me." ECF No. 69-3, Castro Aff. at 3.

[7] Footage later shows Kerawalla explaining to another officer that "I just can't put hands on him with a rifle. I mean, I kinda broke the regs on that, by the way." Garcia Vid. at 00:07:14. Kerawalla later testified that he was referring to the "general accepted practice" that officers with long guns did not participate in arrests and, if officers with long guns must intervene, they are expected to secure their weapons. ECF No. 62-1 at 59.

[8] Passive resistant is defined in the San Antonio Police Department general manual as "a refusal to comply with an officer's verbal commands or open/empty hand control techniques and does not convey a threat to the officer or another person." ECF No. 63-1 at 31.

"red dot" pointed "right on his forehead"). Thornton ordered a K-9 unit to the scene and warned Plaintiff that he was going to "get bit." Thornton Vid. at 00:05:26.[9],[10]

When Officer Shawn King arrived on the scene, he approached Plaintiff's truck with his firearm drawn. King Vid. at 00:00:43. After holstering his weapon, King tried to pull Plaintiff out of the vehicle, telling him to "get out of the truck." *Id.* at 00:01:05; Thornton Vid. at 00:07:31. Thornton followed King and ran towards the truck yelling, "You're gonna get tased!" Thornton Vid. at 00:07:36; Kerawalla Vid. at 0:05:40. Kerawalla also joined the fray, encouraging the officers to "tase him, tase him!" Kerawalla Vid. at 0:05:48.

King pulled on Plaintiff's arm, but Plaintiff remained in his seat and said, "One second, sir." *Id.* at 00:05:50; King Vid. at 00:01:10. In response, King struck Plaintiff in the head and then punched him in the leg. Kerawalla Vid. at 00:05:53 (showing King raising both hands over his head and bringing them down in a striking motion towards Plaintiff's head). Plaintiff repeatedly told the Officers "don't come in" and asked "what I dided? [sic]" King Vid. at 00:01:30. While King and Thornton attempted to pull Plaintiff out of the vehicle, Kory entered the truck from the back seat and ordered Plaintiff to get out of the truck.[11] Kory Vid. at 00:08:00. Finally, King pointed his firearm-mounted light into Castro's car, putting the muzzle approximately two feet from Castro's face. King Vid. at 00:05:56.[12]

---

[9] The K-9 unit arrived on the scene approximately 15 minutes after Castro was handcuffed. King Vid. at 00:19:30. Plaintiff was not released until almost one hour later.

[10] At this point, Plaintiff had not threatened the police, displayed weapons, or tried to flee the scene. He was actively on the phone with dispatch—a fact that does not appear to have been relayed to the Officers on the scene—and was surrounded by three Officers with weapons drawn.

[11] Video footage shows that Kory held a flashlight and, at one point, appeared to point that flashlight at Plaintiff's head. It is unclear whether Kory was using the flashlight mounted to her service weapon, such as the mounted light King used when pulling Plaintiff from the vehicle, or a lighting device separate from her firearm.

[12] ECF No. 62-1 at 52–53. Kerawalla testified that he did not "intervene to stop Mr. King from pointing his weapon at Mr. Castro." *Id.* at 54. Notably, the SAPD Force Matrix prohibits the use of deadly force, including pointing a firearm, in response to passive *or* active resistance. *Id*. at 56–57.

The Officers successfully pulled Plaintiff from the vehicle and then struck him several times in the stomach and groin area. Kerawalla Vid. at 00:06:00; Garcia Vid. at 00:07:55. Once the Officers struck Plaintiff, he wrapped his hands around his stomach and flinched away with his left hand angled up, defensively, repeating "okay, okay." Kerawalla Vid. at 00:06:05; King Vid. at 00:01:45. King, Thornton, and Kerawalla then threw Castro onto the ground several feet from the truck. ECF No. 62-1 at 58. When the Officers instructed him to put his hands behind his back, Plaintiff repeated "okay" and complied. Kerawalla Vid. at 00:06:13. All three officers worked to handcuff Plaintiff. Thornton Vid. at 00:08:15–22; Kerawalla Vid. at 00:06:25. Thornton warned, "You're going to the hospital if you don't give me that hand." *Id.* Once Plaintiff was handcuffed, the Officers patted him down for weapons. No weapons or contraband were found on Plaintiff's person. ECF No. 63-2 at 36–37. Kerawalla informed dispatch shortly thereafter that Plaintiff was in custody. Kerawalla Vid. at 00:06:57. Plaintiff was taken to a squad vehicle, where he was placed in the back seat and detained for over an hour.

### III.    Search of Plaintiff's Vehicle

The Officers began searching Plaintiff's truck immediately after he was handcuffed. Kory searched the driver's side of the cab and identified a delivery manifest. Kory Vid. at 00:09:30–44; ECF No. 59-5 at 15. While she searched the vehicle, Plaintiff explained to Thornton that he was delivering animal supplies. Kory Vid. at 00:09:30–44. Despite hearing this, Kory did not inform the other Officers that the manifest potentially corroborated Plaintiff's statements. *Id.* at 00:09:44–55; ECF No. 59-5 at 15; ECF No. 62-1 at 62 (Kerawalla stating that he was not told another officer found a manifest). Meanwhile, both Thornton and Kory lifted personal belongings, moving items around and searching under Plaintiff's belongings. Kory Vid. at

00:10:10–20. When Plaintiff's belongings were removed from the truck, Kory inspected these items as well. *Id*. at 00:10:30.

After King opened the bay door on the back of the truck, several officers searched the cargo space, King Vid. at 00:02:50; Thornton Vid. at 00:28:00–29:00. The Officers quickly confirmed no other persons were in the truck but continued to search the vehicle. Thornton Vid. at 00:09:16; Kory Vid. at 00:14:45–15:10. Other Officers, including Garcia, were recorded moving boxes around, lightly shaking boxes, and reading labels. King Vid. at 00:22:40–50; Thornton Vid. at 00:28:50; Kory Vid. at 00:19:55; Garcia Vid. at 11:21. A K-9 searched the vehicle and conducted a perimeter search. King Vid. at 00:22:50; Thornton Vid. at 00:33:45.

The Officers did not find any illegal weapons or contraband on Plaintiff's person, in the passenger compartment, or the cargo space of the truck. Garcia Vid. at 01:04:38 (relaying that Officers found "no drugs, no nothing, they checked everything.").

## IV. Plaintiff's Release

Plaintiff remained handcuffed in Thornton's squad car for over an hour. During this time, Thornton and Kory questioned and berated him, threatening to reevaluate his commercial driver's license, and stating, "[Y]ou chose today to make your stand with the San Antonio Police Department and we're the wrong department to take a stand against." Thornton Vid. at 00:19:50. 00:23:01, 00:23:50–56.

Once Sergeant Garcia arrived on the scene, he directed Thornton to call the prosecutor's office to determine whether an Assistant District Attorney ("ADA") was willing to file charges against Plaintiff. Thornton spoke with an unknown ADA and, after describing the incident, the ADA declined to charge Plaintiff. *See* Kory Vid. at 01:14:44 (Thornton reported to the Officers that the ADA said that there was no probable cause to *search* Plaintiff).

After learning that the ADA would not accept charges, Garcia ordered Plaintiff's release. Before releasing Plaintiff from his handcuffs, Thornton asked Plaintiff if he wanted to go to jail and told Kerawalla, "I really want to take him to jail[.]." Thornton Vid. at 01:19:26. Despite knowing that the ADA would not press charges, Kerawalla told Plaintiff that "there's a case that's going to be filed on you, most likely. So, if I were you, I'd start trying to brush up on your law because we're all going to be contacting the DPS [Texas Department of Public Safety] about your commercial driver's license." *Id.* at 1:19:50–20:10. Kerawalla also instructed a Spanish-speaking officer to "tell [Plaintiff] from now on that if someone says it's the police, he cooperates or he gets deported." Garcia Vid. at 01:08:34.

Plaintiff was released from police custody approximately seventy-one minutes after he was handcuffed. Ultimately, Plaintiff was not charged with a crime, nor was he taken to jail. ECF No. 62-1 at 58. Later that morning, he sought evaluation for a possible head injury at Baptist Emergency Hospital, reporting pain in his head, back, knees, wrists, and chest. *See* ECF No. 78-13 at 6–12 (emergency room visit summary). The treating physician noted multiple contusions and abrasions to Plaintiff's head, wrists, knees, and chest. *Id.*; *see also* ECF No. 69-15 (photos of injuries). Plaintiff complained of ongoing pain in his lower back, knee, hand, and ankle. ECF No. 78-13 at 12–78 (chiropractic records). He also alleges that he suffers mental anguish as a result of his interaction with the Officers, including depression, anxiety, and nightmares about the Officers beating him and putting guns to his head. ECF No. 69-3 at 4.

Plaintiff filed his original complaint on August 28, 2020, alleging claims under 42 U.S.C. § 1983 for violations of his rights under the Fourth and Fourteenth Amendments, *see* ECF No. 1, followed by two amended complaints, *see* ECF No 2: ECF No. 18 (the operative pleading). Plaintiff asserts claims for excessive force against Kerawalla, King, and Thornton (Count 1) and

claims for wrongful search and seizure (Counts 2 & 3), failure to intervene (Count 4), and an unconstitutionally prolonged seizure (Count 5) against all four named Officers.

The Court now considers several pretrial motions. Plaintiff seeks to exclude the opinion of Defendants' designated law enforcement expert, James R. Holguin, that the incident occurred in a "high-crime area." ECF No. 58. Both parties have filed motions for summary judgment. Plaintiff moves for partial summary judgment on the question of reasonable suspicion (ECF No. 59), and Defendants seek summary judgment on the basis of qualified immunity (ECF No. 63). The Court considers each motion in turn.[13]

## DISCUSSION

## I.      Motion to Exclude Expert Opinion that Incident Occurred in a "High Crime" Area

Defendants have designated James R. Holguin as a testifying expert on law enforcement policies and practices. *See* ECF No. 39 at 3–4. Holguin served in the SAPD, first as a patrol officer and then as a homicide detective, from 1974 until 2003, when he began his 16-year tenure as the Chief Medical Investigator for Bexar County. ECF No. 58-5 at 8.

Among other things, Holguin is expected to testify: (1) that the SAPD had appropriate arrest, detention, and use-of-force policies; (2) that the Defendant Officers had reasonable suspicion to lawfully detain Jose Castro and used reasonable force in pulling Jose Castro out of the truck; and, most relevant here, (3) that "the Defendant Officers were patrolling a high crime area that had recently been targeted where firearms had been stolen and over thirty burglaries of buildings had occurred recently." ECF No. 39 at 3–4 (Defendants' expert designations); ECF No. 58-4 at 5–6 (Defendants' supplemental designations).

---

[13] Plaintiff also lodges multiple objections to the admissibility of some of the evidence proffered in the Officer's summary judgment briefing. *See* ECF No. 69-2 at 90–104; ECF No. 66. The Court will address those objections herein only to the extent that its summary judgment analysis relies on the evidence in question.

Plaintiff seeks to exclude Holguin's opinion that the incident took place in a "high crime area"—which appears in three places in Holguin's expert report—as unreliable under Rule 702 of the Federal Rules of Evidence. ECF No. 58 (citing ECF No. 58-3 ¶¶ 1–2).

## A.     Legal Standard

Rule 702 of the Federal Rules of Evidence allows a witness "who is qualified as an expert" to testify if:

> a)     the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> b)     the testimony is based on sufficient facts or data;
>
> c)     the testimony is the product of reliable principles and methods; and
>
> d)     the expert has reliably applied the principles and methods to the facts of the case.

FED. R. EVID. 702. The Supreme Court's decision in *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993), provides the analytical framework for determining the admissibility of expert testimony. *Daubert* requires the district courts to act as "gatekeepers" to ensure expert testimony meets Rule 702's standards. *Id.* at 589. As a preliminary matter, a district court "must be assured that the proffered witness is qualified to testify by virtue of his 'knowledge, skill, experience, training, or education.'" *United States v. Cooks*, 589 F.3d 173, 179 (5th Cir. 2009) (quoting FED. R. EVID. 702). If the expert is qualified, a court must follow *Daubert*'s analytical framework to ensure "that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand." *Daubert*, 509 U.S. at 597.

The reliability inquiry entails a preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and can be properly applied to the facts in issue. *Id.* at 592–93. In *Daubert*, the Supreme Court enumerated five nonexclusive

factors to consider when assessing reliability: (1) whether the expert's theory can be or has been tested; (2) whether the theory has been subject to peer review and publication; (3) the known or potential rate of error of a technique or theory when applied; (4) the existence and maintenance of standards and controls; and (5) the degree to which the technique or theory has been generally accepted in the scientific community. *Id*. at 593–94; *see also Burleson v. Tex. Dep't of Crim. Just.*, 393 F.3d 577, 584 (5th Cir. 2004). The test for determining reliability is flexible and can adapt to the particular circumstances underlying the testimony at issue. *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 150 (1999). The point of this inquiry "is to make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Id*.

The relevance inquiry requires the Court to determine whether expert testimony will "assist the trier of fact to understand the evidence or to determine a fact in issue." *Daubert*, 509 U.S. at 591. "Evidence is relevant if . . . it has any tendency to make a fact more or less probable than it would be without the evidence; and the fact is of consequence in determining the action." FED. R. EVID. 401.

A trial court's role as gatekeeper under *Daubert* "is not intended to serve as a replacement for the adversary system." *Pipitone v. Biomatrix, Inc.*, 288 F.3d 239, 250 (5th Cir. 2002) (citing Rule 702 advisory committee's note). Thus, in determining the admissibility of expert testimony, the court should approach its task "with proper deference to the [factfinder]'s role as the arbiter of disputes between conflicting opinions." *Viterbo v. Dow Chem. Co.*, 826 F.2d 420, 422 (5th Cir. 1987). "Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky

but admissible evidence." *Daubert*, 509 U.S. at 596. The party proffering expert testimony has the burden of establishing by a preponderance of the evidence that the challenged expert testimony is admissible. *Moore v. Ashland Chem. Inc.*, 151 F.3d 269, 276 (5th Cir. 1998); *see also* FED. R. EVID. 104.

### B.    Analysis

Plaintiff contends that, while Holguin opines at least three times in his expert report that the incident took place in a "high crime area," the report does not satisfy Rule 26(a)(2)(B)'s requirement that the report explain the basis and reasons for this opinion and the facts or data he considered in forming it. ECF No. 58 at 2 (citing FED. R. CIV. P. 26(a)(2)(B)). The Court agrees.

Defendants' supplemental expert designation states that Holguin intends to testify that the Officers "were patrolling a *high crime area* that had *recently been targeted* where firearms had been stolen and *over thirty burglaries* of buildings had occurred recently." ECF No. 58-4 at 4. Over eight months after their initial designation of Holguin, Defendants submitted, along with their supplemental expert designations, one exhibit in support of Holguin's testimony: a single SAPD Report of a burglary in which firearms had been stolen two days earlier from a pawn shop that was nearly a 15-minute drive from the scene of Plaintiff's detention. *See id.* at 10–12.

To begin, Holguin's expert report fails to state any basis for his opinion that the incident occurred in a "high crime area," and should be stricken for that reason alone. *See* FED. R. CIV. P. 26(a)(2)(B). Even assuming that Holguin reviewed the SAPD police report attached to Defendants' supplemental designations—and there is no indication in his expert report that he did—it does not provide sufficient facts or data on which to base an opinion that the strip mall was located in a "high crime area." *See Allen v. Pa. Eng'g Corp.*, 102. F.3d 194, 199 (5th Cir. 1996) ("[I]f the foundational data underlying opinion testimony are unreliable, an expert will not

be permitted to base an opinion on that data because any opinion from that data is likewise unreliable."). The Court is not required "to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert." *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997). Holguin's testimony may properly be excluded if there is "too great an analytical gap between the data and the opinion proffered." *Id.*

Plaintiff insists that an expert opinion the strip mall was in a "high crime area" should have been based on statistical data, "such as the Lexis-Nexis Community Crime Map, which contains a breakdown of crimes by: geographical location, time, date, type of crime, and allows comparisons of the data to other geographical locations, all of which is taken from SAPD police reports over a six month period." ECF No. 61 at 6. Plaintiff notes that this information "would allow an expert's methodology used to form their expert opinion to be tested for its accuracy and error rate." *Id.* While the Court does not disagree that Plaintiff's proposed methodology would be a permissible and even superior methodology for determining whether a particular location constituted a "high-crime area," it need not determine whether this opinion *must* be supported by sophisticated statistical analyses. Nor is the Court prepared to rule that only a trained statistician is qualified to opine as to whether a given location is a "high crime area."

Still, a district court "must be assured that the proffered witness is qualified to testify by virtue of his 'knowledge, skill, experience, training, or education.'" *United States v. Cooks*, 589 F.3d 173, 179 (5th Cir. 2009) (quoting FED. R. EVID. 702). While Holguin's experience as a patrol officer and homicide detective may very well qualify him as an expert in police policies and procedures, the Court is not convinced that his service on the SAPD, which ended in 2003, qualifies him to opine that specific locations within San Antonio were considered "high crime areas" in 2018. While an expert "might be able to rely on the estimates of others in constructing

a hypothetical reality," in order to do so, "the expert must explain why he relied on such estimates and must demonstrate why he believed the estimates were reliable." *Jacked Up, L.L.C. v. Sara Lee Corp.*, 807 F. App'x 344, 348 (5th Cir. 2020) (per curiam). Assuming that Holguin relied on the assertions in the Officer's police reports and deposition testimony that there had been over 30 burglaries in the area, he does not explain why he believed this estimate was reliable—especially in light of the single police report attached to the Officers' supplemental designations—or how the estimate indicated that the area near the strip mall experienced a higher level of crime than surrounding areas within a specific period of time. In short, there is too great an analytical gap between the data and Holguin's opinions that Plaintiff's encounter with the Officers occurred in a high-crime area. *Joiner*, 522 U.S. at 146.

Accordingly, Plaintiff's motion to exclude Holguin's opinion that the incident occurred in a "high-crime area" (ECF No. 58) is **GRANTED** and shall be **STRICKEN** from his expert report. Holguin will not be permitted to testify concerning "high-crime areas" at trial.

Although not addressed in Plaintiff's motion, the Court further observes that much of Holguin's proposed testimony in Defendants' expert designations appears to be inadmissible. For example, his opinions that the Officers "had reasonable suspicion" and "used reasonable force" (ECF No. 39 at 4; ECF No. 58-4 at 5) constitute inadmissible legal conclusions that invade the province of the Court and do not assist the trier of fact. *See Goodman v. Harris Cnty.*, 571 F.3d 388, 399 (5th Cir. 2009) (expert opinions as to whether a defendant violated the law are inadmissible. FED. R. EVID. 702); *Snap-Drape, Inc. v. C.I.R.*, 98 F.3d 194, 198 (5th Cir. 1996) (experts may not render conclusions of law).

Similarly, much of the proposed testimony appears to merely summarize the contents of the video recordings of the incident. *See*, e.g., ECF No. 39 at 3 ("Expert witness will testify that

the Defendant officers approached an Enterprise Box truck with a driver's side door open and gave verbal commands and identified themselves as San Antonio Police Officers multiple times."). A number of courts addressing expert testimony on video recordings have concluded that the expert should not be permitted to interpret the video's contents where the expert is no better suited than a lay person to do so. *See, e.g.*, *Slack v. City of San Antonio*, No. SA-18-CV-01117-JKP, 2021 WL 1390428, at *4 (W.D. Tex. Apr. 13, 2021), *reconsideration denied*, No. SA-18-CV-01117-JKP, 2021 WL 1857301 (W.D. Tex. Apr. 30, 2021) (excluding testimony). Such testimony will only be admissible at trial insofar as it draws on the video footage for factual support for his opinions.[14]

## II.    Motions for Summary Judgment

### A.    Legal Standard

The Court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. FED. R. CIV. P. 56. To establish that there is no genuine issue as to any material fact, the movant must either submit evidence that negates the existence of some material element of the non-moving party's claim or defense, or, if the crucial issue is one for which the non-moving party will bear the burden of proof at trial, merely point out that the evidence in the record is insufficient to support an essential element of the non-movant's claim or defense. *Little v. Liquid Air Corp.*, 952 F.2d 841, 847 (5th Cir. 1992), *on reh'g en banc*, 37 F.3d 1069 (5th Cir. 1994) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)). Once the movant carries its initial burden, the burden shifts to the nonmovant to show that summary judgment is inappropriate. *See Fields v. City of S. Hous.*, 922 F.2d 1183, 1187 (5th Cir. 1991). Any "[u]nsubstantiated assertions,

---

[14] To the extent such testimony is admitted, the Court expects that it will be subject to cross-examination as Plaintiff disputes Holguin's characterization of much of the video footage. *See* ECF No. 69-2 at 96–98.

improbable inferences, and unsupported speculation are not sufficient to defeat a motion for summary judgment," *Brown v. City of Houston*, 337 F.3d 539, 541 (5th Cir. 2003), and neither will "only a scintilla of evidence" meet the nonmovant's burden. *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (*en banc*). Rather, the nonmovant must "set forth specific facts showing the existence of a 'genuine' issue concerning every essential component of its case." *Morris v. Covan World Wide Moving, Inc.*, 144 F.3d 377, 380 (5th Cir. 1998). The Court will not assume "in the absence of any proof . . . that the nonmoving party could or would prove the necessary facts" and will grant summary judgment "in any case where critical evidence is so weak or tenuous on an essential fact that it could not support a judgment in favor of the nonmovant." *Little*, 37 F.3d at 1075.

For a court to conclude that there are no genuine issues of material fact, the court must be satisfied that no reasonable trier of fact could have found for the nonmovant, or, in other words, that the evidence favoring the nonmovant is insufficient to enable a reasonable [trier of fact] to return a verdict for the nonmovant. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In making this determination, the court should review all the evidence in the record, giving credence to the evidence favoring the nonmovant as well as the "evidence supporting the moving party that is uncontradicted and unimpeached, at least to the extent that evidence comes from disinterested witnesses." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 151 (2000). Although courts must "review evidence in the light most favorable to the nonmoving party, [courts] assign greater weight, even at the summary judgment stage, to the facts evident from video recordings taken at the scene." *Buehler v. Dear*, 27 F.4th 969, 979–80 (5th Cir. 2022) (citing *Carnaby v. City of Hous.*, 636 F.3d 183, 187 (5th Cir. 2011)). The Court "may not make credibility determinations or weigh the evidence" in ruling on a motion for summary judgment,

*Reeves*, 530 U.S. at 150, and must review all facts in the light most favorable to the nonmoving party. *First Colony Life Ins. Co. v. Sanford*, 555 F.3d 177, 181 (5th Cir. 2009).

### B.     Analysis

Defendants seek summary judgment on the basis that Plaintiff's claims are precluded by the doctrine of qualified immunity.[15] Qualified immunity protects public officials from suit and liability for damages under § 1983 unless their conduct violates a clearly established constitutional right. *Mace v. City of Palestine,* 333 F.3d 621, 623 (5th Cir. 2003). In addressing whether qualified immunity applies, courts engage in a two-step inquiry, determining (1) whether a federal statutory or constitutional right was violated on the facts alleged; and (2) whether the defendant's actions violated clearly established rights of which a reasonable person would have known. *Id.* at 623–24. The two steps of the qualified-immunity inquiry may be performed in any order. *Pearson v. Callahan,* 555 U.S. 223, 236 (2009).

Under the second step of the inquiry, "[a] Government official's conduct violates clearly established law when, at the time of the challenged conduct, the contours of a right are sufficiently clear that every reasonable official would have understood that what he is doing violates that right." *Ashcroft v. al-Kidd,* 563 U.S. 731, 741 (2011) (citations, quotation marks and alteration marks omitted). The Court does not need "a case directly on point, but existing precedent must have placed the statutory or constitutional question beyond debate." *Id.* Clearly established law is not determined "at a high level of generality." *Id.* at 742. Instead, "[t]he dispositive question is 'whether the violative nature of particular conduct is clearly established.'" *Mullenix v. Luna,* 511 U.S. 7, 12 (2015) (citation and emphasis omitted). The inquiry must look at the specific context of the case. *Id.*

---

[15] "A good faith assertion of qualified immunity alters the usual summary judgment burden of proof, shifting it to the plaintiff to show the defense is not available." *King v. Handorf*, 821 F.3d 650, 653 (5th Cir. 2016).

"The central concept is that of 'fair warning': The law can be clearly established 'despite notable factual distinctions between the precedents relied on and the cases then before the Court, so long as the prior decisions gave reasonable warning that the conduct then at issue violated constitutional rights.'" *Kinney v. Weaver*, 367 F.3d 337, 350 (5th Cir. 2004) (internal quotations and citation omitted). Courts must judge the reasonableness of an officer's conduct by taking into account the "'tense, uncertain, and rapidly evolving'" circumstances in which officers must often "'make split-second judgments . . . about the amount of force that is necessary in a particular situation.'" *Bush v. Strain*, 513 F.3d 492, 502 (5th Cir. 2008) (quoting *Graham v. Connor*, 490 U.S. 386, 397 (1989)). From this perspective, courts should examine the objective reasonableness of an officer's belief that his or her conduct was lawful under the circumstances.

### 1.    Unlawful Search/Seizure (Counts 2 and 3) against all Defendants

Plaintiff asserts he was unlawfully detained and later arrested without reasonable suspicion or probable cause. Plaintiff asks the Court to find that the Officers lacked reasonable suspicion because they did not have particular, articulable facts that he had been involved in criminal activity, was currently involved in criminal activity, or was about to be involved in criminal activity at any point during their encounter with him on August 30, 2018. *See* ECF No. 59. The Officers respond that the truck's location on private property "in the wooded area adjoining a strip mall" which fit "the modus operendi of other commercial burglaries," coupled with Plaintiff's non-compliance with their orders in violation of Tex. Transp. Code § 542.501, provided reasonable suspicion for Plaintiff's detention. ECF No. 62 at 3.

A Fourth Amendment seizure occurs when law enforcement officers create a show of authority to which a person submits. *See United States v. Mendenhall*, 446 U.S. 544 (1980) (explaining that police can be said to have seized an individual "only if, in view of all of the

circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave"); *California v. Hodari D.*, 499 U.S. 621 (1991); *see, e.g.*, *United States v. McKinney*, 980 F.3d 485, 490 (5th Cir. 2020) (seizure occurred when police ordered woman walking away from officers to return). Typically, seizures can be categorized as "stops" or "arrests," but both are forms of detentions that constitute Fourth Amendment seizures.

Warrantless searches and seizures are presumptively unreasonable, subject to certain exceptions. *United States v. Hill*, 752 F.3d 1029, 1033 (5th Cir. 2014). One exception provides that "officers may briefly detain individuals on the street, even though there is no probable cause to arrest them, if they have a reasonable suspicion that criminal activity is afoot." *United States v. Michelletti*, 13 F.3d 838, 840 (5th Cir. 1994) (en banc) (discussing *Terry v. Ohio*, 392 U.S. 1, (1968)). Reasonable, individualized suspicion that someone being stopped for brief questioning is armed and dangerous must exist before the officer may conduct a pat-down. *Maryland v. Buie*, 494 U.S. 325, 334 n.2 (1990). Whether there is sufficient evidence to support reasonable suspicion is a question of law. *United States v. Monsivais*, 848 F.3d 353, 357 (5th Cir. 2017).

Reasonable suspicion exists if the officer can "point to specific and articulable facts that lead him to reasonably suspect that a particular person is committing, or is about to commit, a crime." *Hill*, 752 F.3d at 1033. It cannot be unparticularized or founded on a mere hunch. *United States v. Jaquez*, 421 F.3d 338, 341 (5th Cir. 2005); *Kansas v. Glover*, 140 S. Ct. 1183, 1187 (2020). The Supreme Court has "said repeatedly that [when determining whether officers had reasonable suspicion, courts] must look at the 'totality of the circumstances' of each case to see whether the detaining officer has a 'particularized and objective basis' for suspecting legal wrongdoing." *United States v. Arvizu*, 534 U.S. 266, 273 (2002) (quoting *United States v. Cortez*, 449 U.S. 411, 417–18 (1981)). "The officer must be able to articulate more than an 'inchoate and

unparticularized suspicion or hunch' of criminal activity." *Illinois v. Wardlow*, 528 U.S. 119, 123–24 (2000) (quoting *United States v. Sokolow*, 490 U.S. 1, 7 (1989); *Terry*, 392 U.S. at 27).

It is clearly established that a seizure must be "justified at its inception." *Hiibel v. Sixth Jud. Dist. Ct.*, 542 U.S. 177, 185 (2004). Because reasonable suspicion must exist before the initiation of an investigatory detention, *Monsivais*, 848 F.3d at 359, courts "consider only the 'information available to the officer[s] at the time of the decision to stop a person.'" *Carroll v. Ellington*, 800 F.3d 154, 171 (5th Cir. 2015) (alteration in original) (quoting *United States v. Silva*, 957 F.2d 157, 160 (5th Cir. 1992)), *cert. denied,* 137 S. Ct. 492 (2016).

The Officers argue that they had reasonable suspicion because "[t]he Enterprise Box Truck was located on private property, at 5:00 a.m. . . .in the wooded area adjoining a strip mall[,] fitting the modus operandi of other commercial burglaries." ECF No. 62 at 3; *see also* ECF No. 59-7 at 10 (Thornton stating that his reasonable suspicion included "the location that [Plaintiff] was parked in, how his vehicle was parked, and the proximity to the strip center."); ECF No. 59-5 at 7 (Kory testifying that the agents had "reasonable suspicion to approach the vehicle because of time of day, location of the truck and where it was parked, the fact that the door was open and we don't know what is going on inside of that truck.").

While officers are "not required to ignore the relevant characteristics of a location," the location did not suggest that any criminal activity had happened or was about to happen. *Wardlow*, 528 U.S. at 124. There were no alarms triggered at Hausman Village and Kerawalla was not aware of any calls for service, reports of suspicious persons or vehicles, or reports of trespassers from the Hausman Village. ECF No. 59-4 at 55–57. Moreover, although the Officers claim that they were investigating recent ATM burglaries, *id.* at 10, they have failed to produce evidence of any such burglaries and at least one officer was unaware of any such burglary

occurring in the thirty days prior to the encounter involving an Enterprise box van, *id*. at 16. Indeed, the only police report that the Officers have produced involved a burglary in which firearms (not an ATM) had been stolen two days earlier from a pawn shop that was a nearly 15-minute drive from Hausman Village. *See* ECF No. 58-4 at 10–12.

Even assuming that Plaintiff was parked in a "high crime area," the fact that an individual is present in an area with a high crime rate, standing alone, "is not enough to support a reasonable, particularized suspicion that the person is committing a crime." *Wardlow*, 528 U.S. at 124; *see also McKinney*, 980 F.3d at 490 (holding that there was no reasonable suspicion for a seizure where officers observed the defendant standing on a sidewalk with three other people near a gas station in a high crime area that had recently been the location of multiple gang-related drive-by shootings).

The Officers further suggest that "the truck being located on private property in a wooded area with the driver's side door open" was "consistent with" "[c]oncerns of human trafficking, terroristic acts or burglaries[.]" ECF No. 62 at 3. Of course, these circumstances are equally consistent with a driver taking a nap after a morning delivery or taking a break to eat breakfast, stretch his legs, or plan his route. *See United States v. Madrigal*, 626 F. App'x 448 (5th Cir. 2015) (defendant's choice to avoid a highway known for numerous police checkpoints was not inherently suspicious given that a law-abiding citizen might also want to avoid the inconvenience and delay of such checkpoints).

While none of the individual circumstances identified by Kerawalla would alone create reasonable suspicion, the Supreme Court has explicitly rejected a "divide-and-conquer analysis," isolating the individual factors underlying an officer's suspicion to determine whether any given factor is "by itself readily susceptible to an innocent explanation" and thus "entitled to 'no

weight.'" *United States v. Arvizu*, 534 U.S. 266, 274 (2002). Rather, the critical inquiry is whether reasonable suspicion arose under the totality of the circumstances. Even if "each of [a] series of acts was 'perhaps innocent in itself,'" the Court has held that, "taken together," they may justify a stop and frisk. *Id.* (quoting *Terry*, 392 U.S. at 22); *see also United States v. Jacquinot*, 258 F.3d 423, 427–28 (5th Cir. 2001) ("Factors that ordinarily constitute innocent behavior may provide a composite picture sufficient to raise reasonable suspicion in the minds of experienced officers."). The Court concludes that, under the totality of the circumstances, the Officers had reasonable suspicion to detain the driver of the truck for questioning.

Moreover, even if the Officers did not have reasonable suspicion at the inception of the detention, they would be entitled to qualified immunity under the "tense, uncertain, and rapidly evolving" circumstances under which the seizure occurred. *Graham*, 490 U.S. at 397. It was well within the scope of Kerawalla's authority to pull into the parking lot, make visual observations about the scene, check the truck's plate number, and call for backup. It is also clear from the record that the Officers did not know whether anyone was in the vehicle when they conducted the "ghost call." Kerawalla testified that he "had the dispatcher run the [truck's] license plate because initially the vehicle had appeared to be abandoned." ECF No. 59-4 at 22. He confirmed that the first time he was aware that anyone was in the truck was when Plaintiff responded to the ghost call. *Id.* at 31. Indeed, this uncertainty about whether there were any occupants in the vehicle was the very reason for initiating contact through a ghost call in the first place. Kerawalla explained, "[I]nstead of walking up into an unknown where you can get shot in the head, sometimes it's better to feign a call out to see if somebody responds. If somebody responds, now your dynamics and your approach are going to change." *Id.*

The dynamics of the interaction did change after the ghost call because Plaintiff refused to comply with the Officers' commands to exit the truck and identify himself, which added to circumstances supporting reasonable suspicion. Even considering the apparent language barrier and Plaintiff's doubts about whether the Officers were "real" police, a reasonable officer could have concluded that Plaintiff violated Texas Transportation Code § 542.501, which provides that a "person may not *willfully* fail or refuse to comply with a lawful order or direction of: (1) a police officer[.]" TEX. TRANSP. CODE § 542.501 (emphasis added). ECF No. 62 at 3. In total, Plaintiff refused to leave the vehicle for nearly seven minutes after the Officers' first order to exit the vehicle and nearly five minutes after Thornton activated his emergency lights until the Officers forcefully removed him from the vehicle. *See* Thornton Vid. at 00:03:00–07:30. The Officers' decision to conduct a ghost call in a dark, wooded area before approaching an apparently abandoned truck was not objectively unreasonable, nor was their belief that Plaintiff's refusal to cooperate established reasonable suspicion sufficient to continue the detention.

Still, Plaintiff's arrest for failing to obey the Officers' commands did not justify the search of his truck. Neither the search-incident-to-arrest exception nor the automobile exception to the presumption against warrantless searches and seizure would apply here. It is clearly established that "[p]olice may search a vehicle incident to a recent occupant's arrest only if the arrestee is within reaching distance of the passenger compartment at the time of the search or it is reasonable to believe the vehicle contains evidence of the offense of arrest." *Arizona v. Gant*, 556 U.S. at 332, 351 (2009). Under the automobile exception, "officers may conduct a search if they have probable cause to believe that the vehicle contains contraband or evidence of a crime." *United States v. Ned*, 637 F.3d 562, 567 (5th Cir. 2011) (internal quotation and citations omitted). Because the Officers pulled Plaintiff from the truck and threw him to the ground before

searching the truck, he was not within reaching distance of either the cab or the cargo area of the truck. Moreover, there is no reason to believe that the vehicle contained any evidence relating to the offense of arrest—failing to comply with the Officers' orders to exit the vehicle and identify himself—or any other crime.

For the foregoing reasons, the Court concludes that the Officers are entitled to qualified immunity with respect to their initial seizure of Plaintiff on August 30, 2018. Accordingly, Plaintiff's motion for partial summary judgment on reasonable suspicion is **DENIED**. The Officers' motion for summary judgment is **GRANTED** as to Plaintiff's claim for wrongful seizure but **DENIED** as to the wrongful search of his truck.

### 2.   Prolonged Seizure (Count 6) against all Defendants

Once the purpose of a valid traffic stop has been completed, the detention or investigative stop must end unless there are additional reasonable suspicions supported by objective and articulated facts. *United States v. Gonzalez*, 328 F.3d 755, 758 (5th Cir. 2003). Here, the salient question is whether the circumstances with which the Officers were confronted constituted specific, articulable factors giving rise to reasonable suspicion to prolong the traffic stop. *See Anderson*, 483 U.S. at 640–41 (discussing the required degree of specificity for "clearly established law").

The Officers' motion purports to move for summary judgment as to Plaintiff's prolonged seizure but never addresses any of its elements or explains why the claim fails as a matter of law. *See generally* ECF No. 63. Accordingly, the Officers have not met their burden on summary judgment. Before the burden shifts to the nonmovant to establish that summary judgment is inappropriate, the movant "must submit evidence that *negates* the existence of some *material element* of the non-moving party's claim or defense, or, if the *crucial issue* is one for which the

nonmoving party will bear the burden of proof at trial, merely point out that the evidence in the record is insufficient to support an *essential element* of the nonmovant's claim or defense. *Little*, 952 F.2d at 847 (emphasis added). "Although Rule 56(e) does not allow a party to rest upon the mere allegations or denials of his pleading when his adversary moves for summary judgment, the Rule does not relieve the movant of his duty to establish the absence of a genuine issue as to material facts. The moving party still has the initial burden, under Rule 56(c), of showing the absence of a genuine issue concerning any material fact, and of showing that judgment is warranted as a matter of law." *Boazman v. Econ. Lab'y, Inc.*, 537 F.2d 210, 213–14 (5th Cir. 1976) (citations and quotation marks omitted).

Presumably, the Officers seek dismissal of the prolonged seizure claim on the basis that they developed reasonable suspicion to believe that Plaintiff had committed a crime or was about to commit a crime during the course of the stop. As Plaintiff points out, however, the investigatory purpose of the detention was complete when they cleared the scene. ECF No. 69-2 at 56. Still, Plaintiff was held in the back of a patrol car in handcuffs for an additional 45 minutes. *Id.*; *United States v. Spears*, 636 F. App'x 893 (5th Cir. 2016) (finding unconstitutionally prolonged detention where officers detained plaintiff for approximately 23 minutes in the back of a patrol car while officers tried to obtain a drug-sniffing dog after issuing a traffic ticket). Beyond reasonable suspicion, the Officers needed probable cause in order to justify Plaintiff's continued detention under these circumstances. *See Massey v. Wharton*, 477 F. App'x 256, 261 (5th Cir. 2012) (citing *United States v. Place*, 462 U.S. 696, 709–10 (1983) ("The length of the detention of respondent's luggage alone precludes the conclusion that the seizure was reasonable in the absence of probable cause. . . .[A]lthough we decline to adopt any outside time limitation for a permissible *Terry* stop, we have never approved a seizure of the

person for the prolonged 90–minute period involved here[.]"); *Freeman v. Gore*, 483 F.3d 404, 413 (5th Cir. 2007) (holding that the plaintiff had been arrested, not merely detained, when the officer threatened the plaintiff with arrest, handcuffed her, and put her in the back of a police car for thirty to forty-five minutes).

The Officers have failed to establish that they are entitled to qualified immunity with respect to Plaintiff's claim for prolonged seizure.

### 3. Excessive Force (Count 1) against Kerawalla, King, and Thornton

Plaintiff asserts a claim for excessive force in violation of the Fourth Amendment against Officers Kerawalla, King, and Thornton. ECF No. 18 at 11–12. Specifically, he alleges that all three Officers used excessive force by aiming their firearms at him. ECF No. 69-2 at 59–71, 74–79. Plaintiff further alleges that King and Thornton deployed constitutionally excessive force by pulling him from the truck and throwing him to the ground and then punching, knee striking, and kicking him, and using joint manipulation and pain compliance as he was passively resisting. *Id.* at 71–74, 79–84. Finally, he asserts that Kerawalla used excessive force in securing his handcuffs too tightly and leaving them for over an hour. *Id.* at 84–86.

The Fourth Amendment guarantees citizens the right "to be secure in their persons . . . against unreasonable . . . seizures" of the person. *See Tennessee v. Garner*, 471 U.S. 1, 7–22 (1985). To establish a claim of excessive force under the Fourth Amendment, a plaintiff must demonstrate: "(1) injury, (2) which resulted directly and only from a use of force that was clearly excessive, and (3) the excessiveness of which was clearly unreasonable." *Tarver v. City of Edna*, 410 F.3d 745, 751 (5th Cir. 2005). The first element turns on the second and third, *Sam v. Richard*, 887 F.3d 710, 714 (5th Cir. 2018), which are typically analyzed together according to

the factors enunciated in *Graham*. *See Hanks v. Rogers*, 853 F.3d 738, 745 (5th Cir. 2017) (analyzing the second and third factors together).

To establish the first element of an excessive force claim, a plaintiff must prove more than a *de minimis* injury. *Tarver*, 410 F.3d at 752. "[A]s long as a plaintiff has suffered 'some injury,' even relatively insignificant injuries and purely psychological injuries will prove cognizable when resulting from an officer's unreasonably excessive force." *Alexander v. City of Round Rock*, 854 F.3d 298, 309 (5th Cir. 2017) (citation and quotation marks omitted).

The second and third elements are not governed by a single generic standard. *Graham*, 490 U.S. at 393. Excessive force claims are necessarily fact-intensive; whether the force used is "excessive" or "unreasonable" depends on the "totality of the circumstances." *Garner*, 471 U.S. 1, 8–9 (2010); *see also Brosseau v. Haugen*, 543 U.S. 194, 201 (2004) (observing that this "area is one in which the result depends very much on the facts of each case"). In making this determination, the Fifth Circuit has instructed courts to apply the so-called *Graham* factors, which include (1) the severity of the crime at issue, (2) whether the suspect poses an immediate threat to the safety of the officers or others, and (3) whether the suspect is actively resisting arrest or attempting to evade arrest by flight. *Poole v. City of Shreveport*, 691 F.3d 624, 638 (5th Cir. 2012) (quoting *Graham*, 490 U.S. at 396). Courts may also consider the "extent of [the] injury inflicted" to determine whether an officer's force was justified, or if it instead "evinced such wantonness with respect to the unjustified infliction as is tantamount to a knowing willingness that it occur.'" *Deville v. Marcantel*, 567 F.3d 156,168 (5th Cir. 2009) (quoting *Whitley*, 475 U.S. at 321). The underlying intent or motivation behind an officer's actions is irrelevant to this determination. *See Poole*, 691 F.3d at 628.

"The 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Id.* (quoting *Graham*, 490 U.S. at 396). While officers may consider a suspect's refusal to comply with instructions in assessing whether physical force is needed to effectuate compliance, they must assess not only the need for force, but also "the relationship between the need and the amount of force used." *Gomez v. Chandler*, 163 F.3d 921, 923 (5th Cir. 1999); *Deville*, 567 F.3d at 167. "The timing, amount, and form of a suspect's resistance are key to determining whether the force used by an officer was appropriate or excessive." *Joseph on behalf of Est. of Joseph v. Bartlett*, 981 F.3d 319, 332–33 (5th Cir. 2020).

The Fifth Circuit has emphasized that determining "the reasonableness of an officer's conduct under the Fourth Amendment is often a question that requires the input of a jury." *Lytle v. Bexar Cnty.*, 560 F.3d 404, 411 (5th Cir. 2009). "When facts are undisputed and no rational factfinder could conclude that the officer acted unreasonably," a court "can hold that an officer acted reasonably as a matter of law." *Id.* at 412. However, "when facts are disputed and significant factual gaps remain that require the court to draw several plaintiff-favorable inferences," a court "must consider what a factfinder could reasonably conclude in filling these gaps and then assume the conclusion most favorable to the plaintiff." *Id.* If a rational factfinder could conclude that the Officers violated the Constitution, the Court must proceed to the qualified immunity question. *Id.*

With respect to the first element of an excessive-force claim, Plaintiff has produced evidence of his injuries, including abrasions to his head, wrist, and knee and ongoing pain in his lower back, knee, hand, and ankle. *See* ECF No. 78-13 at 6–12 (emergency room visit summary); *id.* at 12–78 (chiropractic records); ECF No. 69-15 (photos of injuries). He has also allegedly

suffered mental anguish as a result of his interaction with the Officers, including depression, anxiety, and nightmares about the Officers beating him and putting guns to his head. ECF No. 69-3 at 3. Plaintiff's testimony as to his ongoing pain and the medical records he provided are sufficient to create a fact issue as to whether he suffered more than a *de minimis* injury. *See Hanks v. Rogers*, 853 F.3d 738, 745 (5th Cir. 2017) (allegations of continuing pain, read in light of the contemporaneous medical documentation noting contusions, acute strains, and bruised ribs, stated more than a *de minimis* injury). The question, then, is whether the Officers' use of force was clearly excessive and objectively unreasonable.

Unlike his other claims, Plaintiff's claim for excessive force is not predicated on a lack of reasonable suspicion or probable cause. Indeed, an officer may face liability for excessive force even where an arrest is clearly justified. *See, e.g.*, *Gomez v. Hernandez*, No. SA-20-CV-01252-XR, 2022 WL 17331263, at *5 (W.D. Tex. Nov. 28, 2022) (denying summary judgment on excessive force claim after plaintiff pled nolo contendere to resisting arrest). Similarly, an officer may be justified in his use of force to effect an arrest even when the arrest itself was invalid. *See Freeman*, 483 F.3d at 416–17 ("That the deputies' arrest of Freeman was unlawful on the facts alleged does not, however, mean that any force used by the deputies to effectuate the arrest was necessarily excessive."). Instead, excessive force claims are "separate and distinct from" unlawful arrest claims, and the Courts must analyze a claim for excessive force without regard to whether the arrest itself was justified. *Id.*

Plaintiff's right to be free from excessive force during an investigatory stop or arrest was clearly established at least as early as August 2007. *Newman v. Guedry*, 703 F.3d 757, 763 (5th Cir. 2012). "While the right to be free from excessive force is clearly established in a general sense, the right to be free from the degree of force used in a given situation may not have been

clear to a reasonable officer at the scene." *Hogan v. Cunningham*, 722 F.3d 725, 735 (5th Cir. 2013). Accordingly, the Court analyzes each use of force independently to determine whether the Officers had fair warning that it violated Plaintiff's constitutional rights.

As a preliminary matter, the Fifth Circuit has held that minor, incidental injuries that occur in connection with the use of handcuffs to effectuate an arrest do not give rise to a constitutional claim for excessive force. *Freeman v. Gore*, 483 F.3d 404, 417 (5th Cir. 2007); *see also Tarver*, 410 F.3d at 751. With respect to all other uses of force by the Officers, however, the same standard applies.[16] Whether the Officers' use of force in aiming their firearms at Plaintiff, pulling him from the cab and shoving him to the ground violates a clearly established right depends on whether the Officers reasonably perceived Plaintiff as a threat. *See Flores v. Rivas*, No. EP-18-CV-297-KC, 2020 WL 563799, at *7 (W.D. Tex. Jan. 31, 2020) ("It is . . . objectively unreasonable for a police officer to forcefully brandish a deadly weapon at citizens whom he could not reasonably have perceived to be dangerous.") (citing *Hodge v. Layrisson*, No. 97-cv-555, 1998 WL 564263, at *6 (E.D. La. Sept. 1, 1998)); *Sam v. Richard*, 887 F.3d 710, 714 (5th Cir. 2018) (holding that "it was clearly established . . . that pushing . . . a suspect who is neither fleeing nor resisting is excessive."); *Goodson v. City of Corpus Christi*, 202 F.3d 730, 740 (5th Cir. 2000) (no qualified immunity where plaintiff suffered a broken shoulder as a result of being tackled by officers who lacked reasonable suspicion to detain or frisk him and from whom he was not fleeing).

Under the *Graham* factors, a jury could reasonably conclude the force used was excessive and thus constituted a violation of Plaintiff's constitutional rights. 490 U.S. at 396. With respect

---

[16] In general, each officer's conduct should be considered individually in determining whether qualified immunity applies. *Meadours v. Ermel*, 483 F.3d 417, 421–22 (5th Cir. 2007). Here, however, it is appropriate to consider their conduct collectively because (1) the same standard applies to all of their conduct other than handcuffing, and (2) the Officers have raised a single argument in defense of their use of force—that Plaintiff was "actively resisting" arrest. *See* ECF No. 63 at 11–13.

to the severity of the crime, Plaintiff's failure to comply with police orders—a Class C misdemeanor punishable only by a fine—"militates against the use of force." *Jackson v. City of Austin*, No. 1:17-CV-1098-AWA, 2019 WL 5102575, at *5 (W.D. Tex. Oct. 11, 2019) (citing TEX. PEN. CODE § 12.23 and *Reyes v. Bridgwater*, 362 F. App'x 403, 407 n.5 (5th Cir. 2010) (finding the "severity" factor from *Graham* militated against a use of force where the alleged crime was a misdemeanor). The Officers concede that Plaintiff was not fleeing the scene. ECF No. 69-9 at 104 (Thornton); ECF No. 69-11 at 45 (King); ECF No. 69-6 at 265–66 (Kerawalla); ECF No. 69-7 at 91–92 (Kory agreeing that Plaintiff did not attempt to put the truck in gear).

Still, the Officers insist that their use of force was justified because Plaintiff was "flailing his hands" in "active resistance." ECF No. 63 at 10 (citing *Poole*, 691 F.3d 624 and *Tucker v. City of Shreveport*, 998 F.3d 165 (5th Cir. 2021)); *see also Davidson v. AT&T Mobility,* No. 3:17-CV-0006-DLLC, 2019 WL 486170, at *7 (N.D. Tex. Feb. 7, 2019) (holding that when officer pushed the plaintiff out the door of a store and the plaintiff rapidly turned toward him, in this moment the officer could have perceived this act as a threat). When asked whether Plaintiff presented a threat of bodily injury, Kerawalla testified that Plaintiff was "definitely moving his arms . . . I think he actually tries to grab one of the officer's arms or one of his weapons[.]" ECF No. 59-4 at 47.

Kerawalla's recollection is not supported by the record, particularly the body-worn camera footage. *See Buehler*, 27 F.4th at 979–80 (directing courts to assign greater weight to video evidence at the scene, even on summary judgment). The videos do not show Plaintiff reaching for a weapon or striking the Officers. Indeed, during deposition testimony, Kerawalla modified his statement and stated, instead, that he had no specific recollection of Plaintiff reaching for a weapon. ECF No. 59-4 at 47–48 (stating, "I don't think he grabbed the officer's

gun."). Nor did his police report indicate that Plaintiff tried to grab the Officers' weapons. *Id.* (confirming that if Kerawalla saw Castro reach for a weapon, he would have included this information in his police report). In sum, although Plaintiff resisted being pulled from the truck and attempted to deflect or protect himself against the Officers' strikes, the footage shows that Plaintiff generally posed no physical threat to the Officers. The record does not show that Plaintiff attempted to strike the Officers or that Plaintiff posed any physical threat to them. At the very least, this is a question for the jury.

On Plaintiff's account, he committed no crime, posed no threat to the Officers or anybody else, and did not actively resist. Thus, taking the facts in the light most favorable to Plaintiff, a jury could conclude that the Officers' use of force was objectively unreasonable in light of clearly established law at the time of the incident. *See Sam*, 887 F.3d at 714. At a minimum, determining whether the Officers' conduct was objectively reasonable requires factfinding and credibility assessments and, accordingly, precludes summary judgment on the basis of qualified immunity. *Sanford*, 555 F.3d at 181; *see also Tarver*, 410 F.3d at 754.

### 4.    Failure to Intervene (Count 4) against all Defendants

An officer's failure to intervene can be a constitutional violation under § 1983 if the officer: "(1) knows that a fellow officer is violating an individual's constitutional rights; (2) has a reasonable opportunity to prevent the harm; and (3) chooses not to act." *Whitley v. Hanna*, 726 F.3d 631, 646–47 (5th Cir. 2013). The officer also must be present at the scene of the constitutional violation, and a court should consider whether the officer acquiesced in any conduct violating the individual's constitutional rights. *Id.* at 647 (citing *Hale v. Townley*, 45 F.3d 914, 919 (5th Cir. 1995)).

The Officers' motion purports to move for summary judgment as to Plaintiff's claim for failure to intervene but never addresses any of its elements or explains why the claim fails as a matter of law. *See generally* ECF No. 63. Accordingly, the Officers have not met their burden on summary judgment. *Little*, 952 F.2d at 847; *Boazman*, 537 F.2d at 213–14 (5th Cir. 1976) (citations and quotation marks omitted).

Presumably, the Officers seek dismissal of the failure-to-intervene claim on the basis that Plaintiff failed as a matter of law to establish any underlying constitutional violation. Given the Court's conclusions as to Plaintiff's underlying claims for violation of his Fourth Amendment right to be free from excessive force, summary judgment on his failure-to-intervene claim would be inappropriate. *Sanford*, 555 F.3d at 181.

## CONCLUSION

For the forgoing reasons, Plaintiff's motion to exclude the expert opinion of that the incident occurred in a "high-crime area" (ECF No. 58) is **GRANTED** and shall be **STRICKEN** from his expert report. Holguin will not be permitted to testify concerning "high-crime areas" at trial.

Plaintiff's motion for partial summary judgment as to reasonable suspicion (ECF No. 59) is **DENIED**.

The Officers' motion for summary judgment on the basis of qualified immunity (ECF No. 63) is **GRANTED IN PART** as to Plaintiff's claim for wrongful seizure (Count 2) and **DENIED IN PART** in all other respects.

It is so **ORDERED**.

**SIGNED** this 17th day of March, 2023.

_____
XAVIER RODRIGUEZ
UNITED STATES DISTRICT JUDGE